Filing # 190242077 E-Filed 01/22/2024 01:51:13 PM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE COUNTY, FLORIDA

ANTHONY WHITE,

      Plaintiff(s),

v.

                         Case No: 2024-000744-CA-01

JACKSON HEALTH SYSTEM,
a Miami Dade County Public Trust,

      Defendant(s).

_____/

## SUMMONS IN A CIVIL CASE

**TO:** JACKSON HEALTH SYSTEM, through Miam Dade County Public Trust:

JACKSON HEALTH SYSTEM
1400 N.W. North River Drive
10th Floor, Suite 510
Miami, FL 33125

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY

DANIEL H. HUNT, ESQ.
P.O. BOX 565096
MIAMI, FL 33256

an answer to the complaint which is herewith served upon you, within **21 days** after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Juan Fernandez-Barquin,
Clerk of the Court and Comptroller

                              1/24/2024

CLERK                               DATE

(BY) DEPUTY CLERK   galez

RECEIVED

FEB 0 6 2024

Executive Offices

Filing # 189766422 E-Filed 01/15/2024 05:59:43 PM

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>NIcholas Milano</u>
Plaintiff

Case # _____

Judge   _____

vs.
<u>Jackson Health System</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.    TYPE OF CASE     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐ Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☒ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☒ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☐ Libel/Slander
      ☐ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☒ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   <u>5</u>

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**     **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Daniel Harrison Hunt</u>        Fla. Bar # <u>121247</u>
      Attorney or party                            (Bar # if attorney)

<u>Daniel Harrison Hunt</u>             <u>01/15/2024</u>
(type or print name)                Date

Filing # 189766422 E-Filed 01/15/2024 05:59:43 PM

**IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA**

**NICHOLAS M. MILANO,**

      **Plaintiff(s),**

                                              **Case No:**

**v.**

**JACKSON HEALTH SYSTEM,**
**A Miami Dade County Public Trust,**

      **Defendant(s).**

_____/

## COMPLAINT

The Plaintiff, **NICHOLAS M. MILANO** (hereinafter "Plaintiff" or **"MILANO"**), by and

through the undersigned counsel, hereby sues Defendant, **JACKSON HEALTH SYSTEM** a

Miami Dade County Public Trust (hereinafter "Defendant" or **"JACKSON"**), and in support states

as follows:

### JURISDICTION AND VENUE

1.      This is an action by the Plaintiff for damages exceeding $50,000, excluding

attorney fees or costs, pursuant to the Florida Civil Rights Act of 1992, and Florida Statutes,

Chapter 760, *et seq.* ("FCRA"), to redress injuries resulting from Defendant's unlawful

disability, race, color and sex based discriminatory treatment of Plaintiff **MILANO** as well as

retaliation for same.  This is also a case of FMLA Retaliation.

2.      This is an action by the Plaintiff for damages exceeding $50,000 excluding

attorneys' fees or costs for discriminatory treatment and retaliation predicted on and retaliation

predicated on the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. as well as Plaintiff's

1

race pursuant to the Civil Rights Act of 1866, 42 U.S.C. §1981 ("§ 1981") to redress injuries resulting from Defendant's unlawful race discriminatory treatment of Plaintiff.

3.  This Court has jurisdiction of the claims herein pursuant to the FCRA, FMLA and §1981.

4.  The venue of this action is properly placed in Miami Dade County because the Defendant JACKSON operates a business where plaintiff worked at Jackson Memorial Hospital/Jackson Health System at 110 NW 20th Street, Miami, FL 33127, within the jurisdiction of this Honorable Court.

5.  The Defendant is a Florida government entity known as the Miami Dade County Public Trust administered by Miami Dade County.

6.  Defendant is a covered employer pursuant to Florida Statutes § 760.02(7) as Defendant is and was employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

7.  Plaintiff is a covered employee for purposes of the Florida Civil Rights Act, FMLA and entitled to relief under §1981.

8.  Defendant is alleged to have engaged in an unlawful employment practice pursuant to Florida Law and the FCRA, §760.10 et sec. as well as the FMLA.

9.  Defendant is a covered employer for purposes of the FMLA as they employ more than 50 employees at their location above.

10.  Declaratory, injunctive, legal and equitable relief sought pursuant to the laws set forth above together with attorneys' fees, costs and damages.

**11.**     All conditions precedent for the filing of this action before this Court have been previously met, including the exhaustion of all pertinent administrative procedures and remedies.

### **BACKGROUND**

12.     Plaintiff worked as a Case Manager for Defendant and was hired in November of 2021.

13.     Plaintiff is a white Italian disabled and gay male who and as such, covered under the FCRA and §1981.

14.     Plaintiff is also covered by the FMLA as he applied for intermittent FMLA on or about October 30, 2023 through Defendant's third party adjusting agency, Matrix Absence Management and received confirmation of this from Evelyn Noyola.

15.     Plaintiff worked for Defendant for over 1 year and 1250 hours prior to the use of his FMLA and prior to the issues for which the EEOC Charge of Discrimination was filed.

16.     Plaintiff has exemplary reviews and outstanding comments on his work success. He has won awards.  In fact, witness Cecilia Cruz will testify to his outstanding work ethic and amazing performance for Defendant.

17.     Plaintiff attempted to us his FMLA benefits and was met with direct retaliation by administration/supervisors including but not limited to Michelle Fontes, Latresse Anderson, Carline Rafael and others.

18.     Plaintiff's supervisor, Janisse, had other employees file pretextual complaints against plaintiff due to plaintiff being of a different race than herself, due to his disability and FMLA usage, and because he is gay.

19.     Plaintiff is the only gay white male in his unit.

3

20. Plaintiff suffers from an ADA qualified disability which required him to apply for and get approved for FMLA while working for Defendant.

21. Plaintiff began using intermittent FMLA on March 2, 2023. He was almost immediately cautioned about FMLA usage by Latrese LNU. This was a retaliatory action by Defendant directly due to his race, color, sex and disability vis a vis the FMLA usage.

22. On one occasion plaintiff arrived 45 minutes late to work and was verbally coached for FMLA usage by Zulma, Michelle and Latrese. They expressed their displeasure with this FMLA usage in conjunction with the warnings and pretextual and falsified write-ups.

23. Even though the FMLA was approved by a physician and the Defendant, shortly before the April 10, 2023 meeting, plaintiff was told by Latrese that his FMLA privileges were being revoked. This was due to their displeasure with Plaintiff being a gay white male and having a disability which required FMLA use.

24. Plaintiff submitted medical reports regarding FMLA requirements from Dr. Renee I Ross, LCSW/PsyD.

25. Defendant retaliated against Plaintiff and changed his schedule to 12 pm to 8 pm as a penalty for his FMAL use and for being a white disabled gay male. This was retaliatory in nature and designed to try to get Plaintiff to quit his job resulting in a constructive termination.

26. Additional discrimination came from Gloria, HR who discounted and refused to take action on plaintiff's multiple complaints to HR. Plaintiff was unsupported, unheard and discounted. Defendant, through their accepting of the discrimination perpetuated above, adopted and approved violations of their own policies, Federal and State Laws, and as a result, affirmed the violations and actions of their administrators.

4

27.     Plaintiff was denied union representation which is his right pursuant to the Union Contract.  He was denied this as part of Defendant's cover up of their intentional actions to discrimination against Plaintiff due to their inherent dislike of white gay males with disabilities.

28.     Even Union members told Plaintiff that this was simply a witch hunt by Jackson.

29.     After the above actions, plaintiff was moved to WW11 where he was increasingly micromanaged and set up for failure.  Defendant began providing pretextual and false write ups in order to effectuate their desire to have Plaintiff quit his job.  They made his life miserable.

30.     Plaintiff adopts and incorporates into this complaint the EEOC attachments which are attached to this complaint as **Composite Exhibit A**.

31.     Witnesses include Cecilia Cruz who can attest to the facts in this Complaint.

32.     Plaintiff's direct supervisor was directly involved in these decisions including the decision to terminate plaintiff.

33.     Plaintiff was treated differently than his co-workers due to his FMLA use, race, color sex and disability.

34.     In support of Plaintiff's outstanding work, he received a leadership award known as the Care Badge wherein co-workers recognized his compassion, outstanding work ethic and knowledge, expertise and compassion.

35.     Defendant's abuse of Plaintiff resulted in his need to seek care with Dr. Ross who, in November of 2023 opined that he suffered great emotional damages as a result of Defendant's abuse of Plaintiff.

36.     Plaintiff repeated filed written complaints to HR about his supervisor's bullying. **EXHIBIT B**.

37.     Defendant's intentional interference with Plaintiff's ability to engage in a contractually agreed to employment relationship was subverted by defendant's behavior.

38.     Defendant agreed not to engage in abusive and race related mistreatment of Plaintiff when he was employed but they purported to attack him for his race nonetheless.

39.     Plaintiff was denied a promotion based on the above protected characteristics.

40.     Plaintiff filed a timely US EEOC Charge of Discrimination with the EEOC and concurrently with the Florida Commission on Human Relations on or about October 4, 2023, 510-2023-10474. A Right to Sue letter issued on October 23, 2023 signed by Evangeline Hawthorne, director of the and was copied to respondent, Michelle Kligman at JACKSON. They also have possession of the charge and the Right to Sue as they did issue a rebuttal which is disputed by Plaintiff.

41.     All conditions precedent for the filing of this action before this Court have been previously met, including the exhaustion of all pertinent administrative procedures and remedies.

## COUNT I
## RACE AND COLOR DISCRIMINATION UNDER THE FCRA

42. Plaintiff reasserts his allegations in paragraph 1-41 as if fully set forth herein.

43. Section 760.10 of the FCRA states in relevant part:

"(1)    It is an unlawful employment practice for an employer:

(a)     To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status."

44.     The FCRA accordingly prohibits discrimination based on Race and color.

6

45.     The treatment to which Plaintiff was subjected by Defendant as set forth above and incorporated herein, was the result of Plaintiff's race, which individuals outside Plaintiff's class were not and would not have been subjected, in violation of the FCRA.

46.     Defendant's alleged bases for its adverse conduct against Plaintiff and retaliation against Plaintiff are pretextual and asserted only to cover up the discriminatory nature of its conduct.

47.     Even if Defendant could assert legitimate reasons for its adverse actions against Plaintiff and defendant's adverse write ups, denial of overtime and abuse, which reasons it does not have, Plaintiff's Race was a significant motivating factor for Defendant's adverse conduct toward Plaintiff.

48.     As a result of Defendant's willful and malicious discriminatory actions as a result of his Race and color, Plaintiff has experienced and will continue to experience significant financial and economic loss in the form of lost wages, stress, frustration and lack of work. Plaintiff has also experienced and will continue to experience emotional anguish, pain and suffering and loss of dignity damages.  Plaintiff accordingly demands lost economic damages in the form of back pay and front pay, interest, lost benefits, and compensatory damages if appropriate in this case.

49.     Plaintiff also requests punitive damages based on Defendant's intentional, willful, wanton and malicious discriminatory conduct per statute.

50.  Plaintiff further seeks his attorney's fees and costs as permitted by law.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court:

A. Enter judgment for Plaintiff and against the Defendant on the basis of Defendant's willful violations of the FCRA; and

B. Award Plaintiff compensatory damages including front pay, back pay, and lost benefits; and

C. Award Plaintiff as to this count prejudgment interest; and

D. Award Plaintiff damages for the amount of the costs of litigation and filing including attorney's fees; and

E. Grant such other and further equitable relief as this court deems equitable and just and/or available pursuant to State Law including punitive damages.

## COUNT II
### *Disability Discrimination in Violation of the FCRA*

51. Plaintiff re-adopts each and every factual allegation as stated in paragraphs 1-41 of this Complaint as if set out in full herein.

52. Plaintiff has a physical disability that substantially limits one or more major life activities and is thus a member of a protected class under the FCRA.

53. Plaintiff was regarded as having a disability by Defendant and Defendant's agents as they approved FMLA based on this disability.

54. Defendant verbally reprimanded and retaliated against Plaintiff for using FMLA for his disability and because he had a disability.

55. By the conduct described above, Defendant has engaged in discriminatory conduct against Plaintiff because of Plaintiff's disability and subjected the Plaintiff to disability-based animosity.

56. Such discrimination was based upon the Plaintiff's disability in that Plaintiff would not have been the object of discrimination but for the fact that Plaintiff has a disability.

57. Plaintiff can and did perform the essential functions of his job with or without reasonable accommodation.

58. Defendant's conduct complained of herein was willful and in disregard of Plaintiff's

protected rights. Defendant and its supervisory personnel were aware that discrimination on the basis of Plaintiff's disability was unlawful but acted in reckless disregard of the law.

59. Defendant's discriminatory conduct was directly related to and because of Plaintiff's disability and need/request for disability accommodations.

60. At all times material hereto, the employees exhibiting discriminatory conduct towards Plaintiff possessed the authority to affect the terms, conditions, and privileges of Plaintiff's employment with the Defendant.

61. Defendant retained all employees who exhibited discriminatory conduct toward the Plaintiff and did so despite the knowledge of said employees engaging in discriminatory actions.

62. As a result of Defendant's actions, as alleged herein, Plaintiff has been deprived of rights, has been exposed to ridicule and embarrassment, and has suffered emotional distress and damage.

63. The conduct of Defendant, by and through the conduct of its agents, employees, and/or representatives, and the Defendant's failure to make prompt remedial action to prevent continued discrimination against the Plaintiff, deprived the Plaintiff of statutory rights under State law.

64. The actions of the Defendant and/or its agents were willful, wanton, intentional, and made with malice or reckless indifference to the Plaintiff's statutorily protected rights, thus entitling Plaintiff to damages in the form of compensatory and punitive damages pursuant to state and federal law, to punish the Defendant for its actions and to deter it, and others, from such action in the future.

65. Plaintiff has suffered and will continue to suffer both irreparable injury and compensable damages as a result of Defendant's discriminatory practices unless and until this Honorable Court grants relief.

**WHEREFORE,** Plaintiffs respectfully prays for the following relief against Defendant:

    f.  Adjudge and decree that Defendant has violated the FCRA, and has done so willfully, intentionally, and with reckless disregard for Plaintiff's rights;

    g.  Enter a judgment requiring that Defendant pay Plaintiff appropriate back pay, benefits' adjustment, and prejudgment interest at amounts to be proved at trial for the unlawful employment practices described herein;

    h.  Enter an award against Defendant and award Plaintiff compensatory damages for mental anguish, personal suffering, and loss of enjoyment of life;

    i.  Require Defendant to reinstate Plaintiff to the position at the rate of pay and with the full benefits Plaintiff would have had Plaintiff not been discriminated against by Defendant, or in lieu of reinstatement, award front pay;

    j.  Award Plaintiff the costs of this action, together with a reasonable attorneys' fees; and

    k.  Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

**COUNT III**
**SEX/GENDER DISCRIMINATION UNDER THE FCRA**

66. Plaintiff reasserts his allegations in the paragraphs above, 1-33 as if fully set forth herein.

67. Section 760.10 of the FCRA states in relevant part:

"(1)   It is an unlawful employment practice for an employer:

    (a)   To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status."

68. The FCRA accordingly prohibits discrimination based on sex as a gay male.

69. The treatment to which Plaintiff was subjected by Defendant as set forth above and incorporated herein, was the result of Plaintiff's sex/gender and status as a gay male,

10

which other male and female individuals were not and would not have been subjected, in violation of the FCRA.

70. Defendant's alleged bases for its adverse conduct against Plaintiff and Plaintiff's denials of promotions are pretextual and asserted only to cover up the discriminatory nature of its conduct.

71. Even if Defendant could assert legitimate reasons for its adverse actions against Plaintiff and Plaintiff's termination, which reasons it does not have, Plaintiff's sex/gender was also a motivating factor for Defendant's adverse conduct toward Plaintiff and Plaintiff's abusive treatment by Cassandra and eventual constructive termination.

72. As a result of Defendant's willful and malicious discriminatory actions as a result of his sex, Plaintiff has experienced and will continue to experience significant financial and economic loss in the form of lost wages and lost benefits. Plaintiff has also experienced and will continue to experience emotional anguish, pain and suffering and loss of dignity damages. Plaintiff accordingly demands lost economic damages in the form of back pay and front pay, interest, lost benefits, and compensatory damages.

73. Plaintiff also requests punitive damages based on Defendant's intentional, willful, wanton and malicious discriminatory conduct as is allowed by the FCRA.

74. Plaintiff further seeks his attorney's fees and costs as permitted by law.

WHEREFORE, Plaintiff prays for the entry of a judgment against Defendant:

L. Enter judgment for Plaintiff and against the Defendant on the basis of Defendant's willful violations of the FCRA; and

M. Award Plaintiff compensatory damages including front pay, back pay, and lost benefits; and

N. Award Plaintiff as to this count prejudgment interest; and

O. Award Plaintiff damages for the amount of the costs of litigation and filing including attorney's fees; and

P. Grant such other and further equitable relief as this court deems equitable and just and/or available pursuant to State Law including punitive damages.

<u>**COUNT IV**</u>
<u>**RETALIATION UNDER THE FCRA**</u>

75.     Plaintiff reasserts his allegations in paragraph 1-41 as if fully set forth herein.

76.     Section 760.10(7) states:

> "It is an unlawful employment practice for an employer, an employment agency, a joint labor-management committee, or a labor organization to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section."

77.     The FCRA accordingly prohibits retaliation against an employee for reporting conduct which would violate the terms of the FCRA.

78.     Plaintiff's complaints of discrimination and disparate treatment were protected activities under the FCRA, for which he could not be adversely affected or terminated in retaliation.

79.     Defendant's alleged bases for its adverse conduct against Plaintiff are pretextual and asserted only to cover up the retaliatory nature of its conduct.

80.     Even if Defendant could assert legitimate reasons for its adverse actions against Plaintiff, the removal of Plaintiff's truck and assignment of manual labor when white employees were not treated so poorly, which reasons it does not have, Plaintiff's complaints of

discrimination were significant motivating factors for Defendant's adverse conduct toward Plaintiff.

81.     As a result of Defendant's retaliatory actions, and its willful and malicious discharge of Plaintiff's employment as a result of complaints of discrimination, Plaintiff has experienced and will continue to experience significant financial and economic loss in the form of lost wages and lost benefits.  Plaintiff has also experienced and will continue to experience emotional anguish, pain and suffering and loss of dignity damages.  Plaintiff accordingly demands lost economic damages in the form of back pay and front pay, interest, lost benefits, and compensatory damages.

82.     Plaintiff also requests punitive damages based on Defendant's intentional, willful, wanton and malicious retaliatory conduct per statute.

83.     Plaintiff further seeks his attorney's fees and costs as permitted by law.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court:

Q.   Enter judgment for Plaintiff and against the Defendant on the basis of Defendant's willful violations of the FCRA; and

R.   Award Plaintiff compensatory damages including front pay, back pay, and lost benefits; and

S.   Award Plaintiff as to this count prejudgment interest; and

T.   Award Plaintiff damages for the amount of the costs of litigation and filing including attorney's fees; and

U.   Grant such other and further equitable relief as this court deems equitable and just and/or available pursuant to State Law including punitive damages.

13

<u>**COUNT V**</u>
*Race Discrimination in Violation of 42 U.S.C. § 1981*

51.     Plaintiff Nicholas Milano re-adopts each and every factual allegation as stated in paragraphs 1-41 above as if set out in full herein.

52.     Plaintiff is a member of a protected class under § 1981 as he is white/Caucasian.

53.     By the conduct describe above, Defendant has engaged in discrimination against the Plaintiffs because of Plaintiff's race and subjected the Plaintiff to race-based animosity.

54.     Such discrimination was based upon the Plaintiff's race in that Plaintiff would not have been the object of discrimination but for the fact that Plaintiff is white/Caucasian.

55.     Defendant's conduct complained of herein was willful and in disregard of Plaintiff's protected rights.   Defendant and its supervisory personnel were aware that discrimination on the basis of race was unlawful but acted in reckless disregard of the law.

56.     At all times material hereto, the employees exhibiting discriminatory conduct towards Plaintiff possessed the authority to affect the terms, conditions, and privileges of Plaintiff's employment with the Defendant.

57.     Defendant retained all employees who exhibited discriminatory conduct toward the Plaintiff and did so despite the knowledge of said employees engaging in discriminatory actions.

58.     As a result of Defendant's actions, as alleged herein, Plaintiff has been deprived of rights, has been exposed to ridicule and embarrassment, and has suffered emotional distress and damage.

59.     The conduct of Defendant, by and through the conduct of its agents, employees, and/or representatives, and the Defendant's failure to make prompt remedial action to prevent continued discrimination against the Plaintiff, deprived the Plaintiff of statutory rights under federal law.

60.     The actions of the Defendant and/or its agents were willful, wanton, and intentional, and with malice or reckless indifference to the Plaintiff's statutorily protected rights, thus entitling Plaintiff to damages in the form of compensatory and punitive damages pursuant to federal law, to punish the Defendant for its actions and to deter it, and others, from such action in the future.

61.     Plaintiff has suffered and will continue to suffer both irreparable injury and compensable damages as a result of Defendant's discriminatory practices unless and until this Honorable Court grants relief.

62.     So that Plaintiff's rights may be protected, Plaintiff has retained the undersigned counsel who is entitled to attorney's fees pursuant to 42 U.S.C. § 1988, the Civil Rights Attorney's Fee Award Act.

**WHEREFORE**, Plaintiffs respectfully prays for the following relief against Defendant:

R. Adjudge and decree that Defendant has violated 42 U.S.C. § 1981, and has done so willfully, intentionally, and with reckless disregard for Plaintiff's rights;

S. Enter a judgment requiring that Defendant pay Plaintiff appropriate back pay, benefits' adjustment, and prejudgment interest at amounts to be proved at trial for the unlawful employment practices described herein;

T. Enter an award against Defendant and award Plaintiff compensatory damages for mental anguish, personal suffering, and loss of enjoyment of life;

U. Require Defendant to reinstate Plaintiffs to the position at the rate of pay and with the full benefits Plaintiffs would have had Plaintiffs not been discriminated against by Defendant, or in lieu of reinstatement, award front pay;

V. Award Plaintiffs the costs of this action, together with a reasonable attorney fees; and

W. Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

**COUNT VI**
*Retaliation Under the FMLA*

63. Plaintiff re-adopts each and every factual allegation as stated in paragraphs 1-41 above as if set out in full herein.

64. Plaintiff is an individual entitled to protection under the FMLA having worked the prerequisite number of hours during the prior year.

65. Plaintiff is an employee of Defendants within the meaning of the FMLA.

66. Plaintiff engaged in protected activity within the meaning of the FMLA by asking for days off on March 8, 2023 and applying for intermittent FMLA from Defendants' third party administrator, Matrix, Defendant's Agent.

67. Defendants retaliated against Plaintiff for exercising rights protected under the FMLA by terminating her the same day for pretextual reasons and reasons others were not terminated for showing bias by Defendants.

68. Defendants' actions constitute a violation of the FMLA.

69. As a result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages.

**WHEREFORE**, Plaintiff respectfully prays for the following relief against Defendants:

X. Adjudge and decree that Defendants has violated the FMLA and has done so willfully, intentionally and with reckless disregard for Plaintiff's rights;

Y. Enter a judgment requiring that Defendants pay Plaintiff appropriate back pay, front pay, benefits' adjustment, and prejudgment interest at amounts to be proved at trial for the unlawful employment practices described herein;

Z.  Enter an award against Defendants and award Plaintiff compensatory damages for mental anguish, personal suffering, and loss of enjoyment of life;

AA.  Require Defendants to reinstate Plaintiff to his position at the rate of pay and with the full benefits he would have, had she not been discriminated against by Defendants, or in lieu of reinstatement, award him front pay;

BB.  Award Plaintiff the costs of this action, together with a reasonable attorney fees; and

CC.  Grant Plaintiff such additional relief as the Court deems just and proper under the circumstances.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on each of his above claims.

Date:  January 15, 2023

Respectfully submitted,

_/s/  Daniel H. Hunt_
Daniel H. Hunt, Esq.
Florida Bar No.: 121247
PO BOX 565096
Miami, FL 33256
dhuntlaw@gmail.com
Telephone: (305) 495-5593
Facsimile: (305) 513-5723

Attorney for Plaintiff

# EXHIBIT A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 510-2023-10474 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| I Name (indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.) | Home Phone | Year of Birth |
|---|---|---|
| Mr. Nicolas M. Milano | | |

**Street Address**

---

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| JACKSON MEMORIAL HOSPITAL | 201 - 500 Employees | (734) 525-9712 |

**Street Address**

1100 NW 20TH ST.

MIAMI 33127

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

**Street Address**                              City, State and ZIP Code

---

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Disability, Race, Retaliation, Sex | 09/20/2023 | 09/20/2023 |

---

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

I was hired in November 2021, as a Case Manager. I have received positive reviews, and my work has been praised. However, I have been harassed and bullied by my supervisor, punished for using my intermittent FMLA, and had her seek out other people to file complaints against me. I feel she is harassing me in order to push me out. I am the only gay white male in the unit. I believe I am being discriminated and retaliated against due to my disability, race and sexual orientation in violation of the Americans with Disabilities Act Amendments Act and Title VII of the Civil Rights Act of 1964, as amended.

**See Attached Document***

---

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>Digitally Signed By: Mr. Nicolas M. Milano<br><br>10/04/2023 | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |
| *Charging Party Signature* | |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please notify EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

When I joined the team in November 2021, I was encouraged and expected to escalate any problems regarding barriers to patient discharge to my immediate supervisor, directors, and the physician advisor team. My understanding was that these communications were confidential and primarily aimed at identifying opportunities for positive changes in our workplace.

On June 1st, 2022, I sent an email outlining the challenges we were facing, which also documented my prior efforts to resolve the issue with the staff and our unit manager. It's essential to clarify that there were no altercations or disagreements with the staff during my attempts to address the issue.

Shortly after sending that email, I was called into Michelle's office, with my immediate supervisor, Janisse, present. During the meeting, Michelle expressed her disappointment with my "behavior and delivery," which left me somewhat confused. It was later revealed that she had shared the email with the individuals discussed in it, leading to unintended consequences, including retaliation and strained relationships with the unit manager and some of the staff members involved.
Regrettably, this incident has made me hesitant to send further escalation emails, as I had believed they were intended for internal discussion to improve our work environment.

"In December, I saw an opportunity to transfer to the UR department, which would have allowed me to work from home. I pursued this transfer because it would have resolved some of the challenges I was facing in my current role, which occasionally caused concerns at work.

On Tuesday, December 29th, 2022, I was called into an impromptu meeting in Latrese's office, without prior knowledge of the agenda. While waiting for Latrese, I engaged in a casual conversation with Michelle, wishing her happy holidays and discussing the holiday season. During our conversation, Michelle inquired about the status of the UR position. I informed her that I wasn't privy to that information and mentioned that my request for the transfer was primarily motivated by personal factors, including health, financial considerations, and travel convenience.

Later in the meeting with Latrese, she asked how I felt about working in WW7. I expressed my contentment with my current role in 4 B but clarified that I had previously requested a transfer to UR along with other CMs. The conversation continued, and I was informed that I would be moved to WW7 because Diana was transitioning to UR, and Dr. Garcia had suggested me as her replacement. I expressed my gratitude for the opportunity but was informed that I didn't have a choice in the matter.

"After being informed of my transfer to WW7 on Monday, January 16th, 2023, I contacted my immediate supervisor, who was on vacation at the time, to share the unexpected development. She was unaware of these intentions. In response to the situation, I reached out to Wesley from the union for guidance and was advised to continue working as usual while they worked with legal resources to address the matter. I adhered to this advice and maintained my regular work routine.
During the week following the notification of my transfer, I experienced an illness that required me to take a leave of absence. During this time, I communicated with Wesley and also reached out to Gloria from HR to express my concerns regarding the recent events. I felt that these circumstances placed me in a potentially hostile environment with the possibility of retaliation.

Upon my return to work the following week, I was called into a meeting with Michelle. I informed Wesley about this development, and although he indicated that he had not been made aware of it beforehand, he advised me to attend the meeting and keep him informed about the outcome."

"On March 29th, 2023, I was involved in a meeting with Michelle, Latrese, Zulma, my new supervisor, and myself. During this meeting, Michelle questioned my interactions with Gloria and another staff member, expressing concerns about my feelings of being threatened and my perceived behavior. I made two requests for a union representative to be present due to the tone and implications of the discussion, but both requests were denied with the explanation that I was not being written up.

I felt pressured to accept their perspective that I was not being bullied, even when Latrese referred to me as "a liar" regarding details from a December conversation. After asserting my boundaries, I assured them of my commitment to continue performing my job effectively. I immediately informed Wesley and Martha about the events of the meeting.

Upon transitioning to WW7, I noticed that my previously established arrangement to start work at 9 am was being questioned. This arrangement had been made when I initially joined the company and was contingent on it not interfering with my work and no complaints being received. Throughout my tenure at JMH, I consistently worked long hours, often exceeding 9 to 10 hours a day, without any complaints and with a willingness to assist colleagues whenever needed. In March alone, I received 12 We Care badges, which is a testament to my dedication to my work.

Furthermore, I've been dealing with ongoing medical issues and had been in the process of obtaining intermittent FMLA, which commenced on March 2nd."
I had called in sick on a Wednesday but I didn't want to call out for three days, I wanted to be a team player given our short-staffed situation, but I also needed empathy. I offered to make myself available.I even volunteered to work on Saturday to make up for the missed day, even though it wasn't my preference. I shared these concerns with Latrese, who agreed but cautioned against making this a habit.

The next day, I called in the morning to notify the staff that I would be in at 9:45 due to a necessary prescription pick-up from my MD, as the pharmacy opened at 9 a.m. When I arrived, I encountered Latrese and Michelle, who greeted me with an ominous air of discontent. Subsequently, Zulma confirmed their displeasure.

I initiated a candid conversation with Zulma, addressing my concerns about the seemingly pedantic nitpicking of good employees, which, in my view, left little room for a productive and enjoyable workplace.

On the following Monday, I was called into Latrese's office, where I was informed that my special privileges were revoked, and I was expected to start work at 8 am within a month. Knowing that this change would be impossible due to my home obligations, I reached out to the Union for assistance. I filed a complaint through the Union to HR before attending the meeting on April 10, 2023.

As we previously discussed, the meeting did not yield a favorable outcome. Per Latrese's recommendation, I was subsequently scheduled to work from 12 pm to 8 pm, even though it wasn't my preferred schedule at that point."

Here is a concise summary of my experience that day which served as a complaint

May 25, 2023
To Whom It May Concern,

I am writing to formally file a complaint against Gloria the HR case manager. In her role as an HR representative, it is essential that she maintains impartiality and objectivity in addressing employee concerns. However, I have encountered a series of issues where her actions and handling of situations have raised concerns.

On previous occasions, I approached Gloria with concerns about being in a hostile work environment, where I believe I have been subjected to bullying and retaliation for asserting my rights. Instead of conducting a thorough investigation or providing support, her response was to inform my Director of my statements and take no further action.

In a specific incident, I was isolated in a meeting with the Assistant Director and Supervisor, where I requested union representation but was denied. During this meeting, I felt interrogated and pressured into believing that the actions of my supervisors were not bullying. This approach left me feeling unsupported and unheard.

During a subsequent encounter with Gloria, I attempted to discuss my concerns and questioned her actions, particularly the lack of a prior meeting to address my complaints. Her response was evasive, and she abruptly left my office, stating that she perceived the situation as hostile.

In another incident involving a dispute over my working hours, Gloria's conduct further exacerbated the situation. During a meeting, she positioned herself between my supervisor and the Director, suggesting a "you two against us" dynamic. Her demeanor during the meeting was condescending, and she sided with my supervisor while minimizing my concerns.

Additionally, there was an incident where I unintentionally addressed her as "Hun," and she reacted strongly, instructing me not to contact her again. I apologized and agreed not to repeat the mistake.

It's important to note that Gloria's complaint against me contains exaggerations, inaccuracies, and falsehoods, which I view as an attempt to assassinate my character. Prior to this, I had also expressed my distrust of her by requesting that my complaint against my supervisor and directors be forwarded to her superiors for review.

I am filing this formal complaint to express my concerns about Gloria's handling of these situations and to request a fair and unbiased resolution.

"After being moved to WW11, I found it increasingly challenging to stay focused due to a constant sense of being "under the microscope." One month after our last meeting, on May 19, 2023, I was called into Latrese's office, where it was revealed that Gloria had initiated a write-up against me. I declined to sign it, as the content appeared exaggerated, a sentiment later confirmed by Wesley. While discussing the situation in Latrese's office, Michelle walked by and uttered what I believed to be a derogatory word directed at me, accompanied by an eye-roll. Although tempted to address this behavior, I refrained from doing so. The cumulative stress from these incidents had a significant impact on my well-being, leading me to question my self-worth.

In a later meeting with Michelle regarding Gloria's complaint, I approached the conversation humbly and expressed my desire to put the conflicts behind me. I conveyed my wish for fairness and respect while emphasizing my commitment to performing my job effectively. Michelle agreed and recommended placing me on the Complex Team, taking into consideration my FMLA status, among other factors."

"From the very beginning of my assignment to the Complex Team, I sensed an uncomfortable working atmosphere under my new supervisor. I felt subjected to excessive micromanagement, receiving more discipline than support.

On the weekend of June 10th, I covered my previous floor, WW7, where I encountered a high volume of cases that needed attention due to prior neglect during the week. Three particular cases demanded significant effort and commitment. I collaborated effectively with the weekend supervisor, Carmen, as well as with patients and their families. My dedication to the work was evident as I went above and beyond, completing tasks such as PASSRS and Transfer forms, which are seldom handled on weekends. I also maintained communication with Zulma, providing her with updates on the cases' progress for discussion during Rounds.

Despite my efforts to support the team, the new Case Manager, Denise, raised concerns that I had altered her discharge plans for the patients. I found this puzzling because these cases lacked solid discharge plans or had incorrect ones. I inquired if she had reviewed these cases, but received no clear response. Instead, I was instructed that in the future, when working weekends, I must contact Carlene for clearance before making any decisions. I accepted this directive, though I found it harsh and extreme.

Carlene subsequently sent me an email outlining these instructions, to which I responded, reiterating that I disagreed with her assessment. I stood by the work I had done and offered to sit down and review the cases. It became evident that there was a different agenda at play, one characterized by harsh critiques and unrealistic demands, making it increasingly difficult to achieve positive outcomes."
"I encountered several limitations in my role on the Complex Team, including restrictions on computer usage and a directive not to seek assistance from unit social workers, despite their potential support. I was also required to attend rounds on multiple units. When faced with negative feedback, I sought guidance from my supervisor, but I did not receive the support I needed.

On July 11th, I received a text message from Carline about a supposed one-to-one meeting invitation that I had not received earlier. It turned out to be a two-on-one meeting, and I had agreed to attend but requested union representation. During this meeting, Michelle and Carline expressed their dissatisfaction with my use of FMLA and indicated that it was not acceptable on the Complex Team due to staffing concerns. Consequently, I was informed of another transfer, this time back to WW7. Coincidentally, it was announced the following week that Denise would be promoted to a supervisor role, after only four months of her tenure at JMH." My experiences continued to be challenging, with the most recent move being to WW7, marking my fifth transfer since February. The added stress has taken a toll on my performance, and it feels like a never-ending cycle of stressors arising.

During my time at WW7, I took on a particularly complex case involving a patient who was battling lung cancer that had metastasized to his bones and was also being treated for neurosyphilis. I diligently created three discharge plans and collaborated closely with the patient's family to ensure their needs were met. I even engaged with hospitality services to secure a letter from the MD for the Cuban Consulate to facilitate the entry of the patient's sister into the U.S. After rounds, the attending physician expressed amazement at the work I had done and expressed her satisfaction in working with me.

My desk is in close proximity to the desk of another case manager, Drayshawn, who was assigned to outlier days with Carline at that time. When Drayshawn, who was doing outlier days with Carline, inquired about the patient's discharge, I informed her that I was currently with the patient's sister, and the discharge plan remained unchanged. This innocuous exchange led to Carline initiating another write-up against me. She even went to the extent of contacting the social worker to confirm the patient's sister's presence in the office, resulting in yet another complaint from Carline."

"At an impromptu meeting attended by Michelle, administrators, and case management staff discussing the move to the nurse's station, concerns were raised about privacy and the potential for discussions about patients. Stephanie expressed concerns, specifically regarding potential HIPAA violations. Michelle's response was that she had no control over the situation, emphasizing that nurses and staff engage in patient-related conversations every day, suggesting that there was no reason for concern about HIPAA violations. However, when Stephanie persisted in her concerns, Michelle attempted to assert professionalism and stated, 'you will maintain your professionalism.'
This raises questions about the consistency of Michelle's stance, as she allowed her supervisor to proceed with a complaint against me,, despite emphasizing the importance of professionalism in these situations."

I have been facing a continuous stream of exaggerated complaints and subsequent write-ups that appear to lack merit and instead come across as personal attacks on my good standing within the hospital. This pattern of exaggerated complaints and write-ups, seemingly motivated by personal factors, has raised concerns that it might ultimately lead to my termination.

The most recent concern that has been emerging over the past month and a half was raised by Gentiva representative Sheryl Friedman, which Carlene brought to our attention on September 20th. I was genuinely taken aback by this development as I had not encountered any issues or disputes, and I believe the complaints were inaccurately documented. I subsequently discussed this matter with Sheryl's colleague and learned that both were approached by Carlene with a request to draft a letter of complaint against me. It was stated they felt harassed with persistent phone calls. Sheryl later contacted me with profuse apologies, explaining that she felt pressured and expressing her intention to write a letter on my behalf. She conveyed that she believes I am a person of integrity who doesn't deserve to be entangled in this situation, and she is committed to doing whatever it takes to rectify the matter.  This only confirms my feelings as well as Martha's statements " this feels like a witch hunt". I am left questioning whether such conduct aligns with the expected behavior of a supervisor.

The subsequent week, I received communication from both my supervisor and the Director. They were apprised of my conversation with a representative from Gentiva, during which the term 'insubordination' was raised. I was explicitly instructed not to make any further contact with Gentiva, specifically the hospice representative. According to guidance from our union representative, it is our understanding that their directive may not be within their authority."

During the subsequent week, I encountered Sheryl in the main lobby, and she seemed visibly anxious and distressed. She confided in me that she had been explicitly instructed not to engage in conversation with me, and she harbored genuine fears about potential job loss. This situation had pushed her to the point of tears, as she was subjected to distressing conduct from our directors. In their relentless campaign to undermine me, they have blatantly disregarded numerous policies and ethical codes set forth by the organization, including those established by Jackson.

It's disheartening to hear that your hard work and achievements haven't been recognized in the way they deserve. Feeling singled out and facing such challenges can be emotionally draining. Discrimination or harassment in the workplace is never acceptable, and it's important to seek support and resolution for these issues. Everyone of Jacksons employees have the right to a fair and inclusive work environment. Please consider discussing my concerns with my union, myself as well as doing a thorough investigation to address these issues and explore ways to improve our workplace experience. Everyone's abilities and contributions deserve acknowledgment and respect and I feel my extraordinary abilities and accomplishments are being purposely overlooked due to their personal agenda.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Miami District Office
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 10/23/2023

**To:** Mr. Nicolas M. Milano

Charge No: 510-2023-10474

EEOC Representative and email:      JEANETTE WOOTEN
Investigator
jeanette.wooten@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 510-2023-10474.

On behalf of the Commission,

Digitally Signed By:Evangeline Hawthorne
10/23/2023

Evangeline Hawthorne
Director

**Cc:**
Michelle Kligman
1100 NW 20TH ST
Miami, FL 33127

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request

identifying your request as a "FOIA Request" for Charge Number 510-2023-10474 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 510-2023-10474 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

☐ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

☐ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

## "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

☐ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

☐ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

☐ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT B

To Whom It May Concern:

Please allow this letter to serve as my complaint of discrimination against my director Michelle Fontes, Assistant Director Latresse Anderson, and former supervisor Carline Rafael Over the past few months, I have been harrassed unduly written up and a target of discrimination and I-have been working with the Union to clear my name and reputation. For over eight months, I have endured a continuous onslaught of unethical, ruthless, manipulative, and vicious behavior, marked by slanderous allegations that are, more often than not, unfounded or greatly exaggerated, originating from the individuals previously mentioned. I belie

The most recent concern that has been emerging over the past month and a half was raised by Gentiva representative Sheryl Friedman, which Carlene brought to our attention on September 20th. I was genuinely taken aback by this development as I had not encountered any issues or disputes, and I believe the complaints were inaccurately documented. I subsequently discussed this matter with Sheryl's colleague and learned that both were approached by Carlene with a request to draft a letter of complaint against me. It was stated they felt harassed with persistent phone calls. Sheryl later contacted me with profuse apologies, explaining that she felt pressured and expressing her intention to write a letter on my behalf. She conveyed that she believes I am a person of integrity who doesn't deserve to be entangled in this situation, and she is committed to doing whatever it takes to rectify the matter.  This only confirms my feelings as well as Martha's statements " this feels like a witch hunt". I am left questioning whether such conduct aligns with the expected behavior of a supervisor. The following week I was contacted by Denise and Michelle berating me for contacting Gentiva. I then received an email forbidding me to contact Gentiva.

During the subsequent week, I encountered Sheryl in the main lobby, and she seemed visibly anxious and distressed. She confided in me that she had been explicitly instructed not to engage in conversation with me, and she harbored genuine fears about potential job loss. This situation had pushed her to the point of tears, as she was subjected to distressing conduct from our directors. In their relentless campaign to undermine me, they have blatantly disregarded numerous policies and ethical codes set forth by the organization, including those established by Jackson.

I have meticulously compiled six pages of well-documented evidence, complete with timelines, detailing the sustained unjust treatment I have endured. This dossier includes statements, witness accounts, as well as text and email correspondence that unequivocally supports my position and refutes these allegations. Regrettably, despite my efforts, neither HR nor upper management has displayed any discernible interest or willingness to consider this compelling body of evidence. Given the lack of responsiveness from HR and upper management despite the substantial evidence I've presented, it leads me to conclude that I may be experiencing discrimination based on personal biases related to my protected characteristics. I possess compelling evidence, including statements and witnesses, that substantiate these claims.

In response, I offered her my unequivocal support and assured her that I would assist in any way necessary. It has come to my attention that the actions of my directors have taken a rather devious, brazen, and malicious turn, extending even to involving vendors in their efforts to terminate my employment.

As I reflect, it seems more apparent these actions are a continuation from previous months. Which appear to be based on a discrimination level focusing on my protective characteristics than on my work performance.These constant incursions are becoming more personal and very uncomfortable to focus on the work at hand. I have been in talks with the union and moving forward in the UR position. I am asking for your help as a dedicated employee. I hope you will take this complaint seriously to resolve this problem and find a resolution.

Sincerely,

Nicolas Milano

April 9th 2023

To Whom It May Concern:

Please allow this letter to serve as my complaint of discrimination against my immediate supervisor
Zulma Valdes and her immediate supervisors.. This is regarding recent events that happened last week
and and as I reflect it seems more apparent these actions are a continuation from previous months.
Which appear to be based on a discrimination level focusing on my protective characteristics than on my
work performance.These constant incursions are becoming more personal and very uncomfortable to
focus on the work at hand. I have been in talks with the union and moving forward for the UR position. I
am asking for your help as a dedicated employee. I hope you will take this complaint seriously to resolve
this problem and find a resolution.

Sincerely,

Nicolas Milano

To Whom It May Concern:

Please allow this letter to serve as my complaint of discrimination against my director Michelle Fontes, Assistant Director Latresse Anderson, and former supervisor Carline Rafael Over the past few months, I have been harrassed unduly written up and a target of discrimination and I-have been working with the Union to clear my name and reputation. For over eight months, I have endured a continuous onslaught of unethical, ruthless, manipulative, and vicious behavior, marked by slanderous allegations that are, more often than not, unfounded or greatly exaggerated, originating from the individuals previously mentioned. I belie

The most recent concern that has been emerging over the past month and a half was raised by Gentiva representative Sheryl Friedman, which Carlene brought to our attention on September 20th. I was genuinely taken aback by this development as I had not encountered any issues or disputes, and I believe the complaints were inaccurately documented. I subsequently discussed this matter with Sheryl's colleague and learned that both were approached by Carlene with a request to draft a letter of complaint against me. It was stated they felt harassed with persistent phone calls. Sheryl later contacted me with profuse apologies, explaining that she felt pressured and expressing her intention to write a letter on my behalf. She conveyed that she believes I am a person of integrity who doesn't deserve to be entangled in this situation, and she is committed to doing whatever it takes to rectify the matter.  This only confirms my feelings as well as Martha's statements " this feels like a witch hunt". I am left questioning whether such conduct aligns with the expected behavior of a supervisor. The following week I was contacted by Denise and Michelle berating me for contacting Gentiva. I then received an email forbidding me to contact Gentiva.

During the subsequent week, I encountered Sheryl in the main lobby, and she seemed visibly anxious and distressed. She confided in me that she had been explicitly instructed not to engage in conversation with me, and she harbored genuine fears about potential job loss. This situation had pushed her to the point of tears, as she was subjected to distressing conduct from our directors. In their relentless campaign to undermine me, they have blatantly disregarded numerous policies and ethical codes set forth by the organization, including those established by Jackson.

I have meticulously compiled six pages of well-documented evidence, complete with timelines, detailing the sustained unjust treatment I have endured. This dossier includes statements, witness accounts, as well as text and email correspondence that unequivocally supports my position and refutes these allegations. Regrettably, despite my efforts, neither HR nor upper management has displayed any discernible interest or willingness to consider this compelling body of evidence. Given the lack of responsiveness from HR and upper management despite the substantial evidence I've presented, it leads me to conclude that I may be experiencing discrimination based on personal biases related to my protected characteristics. I possess compelling evidence, including statements and witnesses, that substantiate these claims.

In response, I offered her my unequivocal support and assured her that I would assist in any way necessary. It has come to my attention that the actions of my directors have taken a rather devious, brazen, and malicious turn, extending even to involving vendors in their efforts to terminate my employment.

As I reflect, it seems more apparent these actions are a continuation from previous months. Which appear to be based on a discrimination level focusing on my protective characteristics than on my work performance.These constant incursions are becoming more personal and very uncomfortable to focus on the work at hand. I have been in talks with the union and moving forward in the UR position. I am asking for your help as a dedicated employee. I hope you will take this complaint seriously to resolve this problem and find a resolution.

Sincerely,

Nicolas Milano